UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RAPID HOT FLOW, LLC, a Colorado limited liability company,<br><br>                   Plaintiff,<br><br>     v.<br><br>ROCKY MOUNTAIN OILFIELD SERVICES, LLC, an Idaho limited liability company, SOUTHERN FIELD WELDING, LLC., an Idaho limited liability company, MATTHEW MASON, an Idaho resident, MICHAEL NEIL JUSTESEN, an Idaho resident, and DOES 1 - 10, inclusive,<br><br>                  Defendants. | Case No. 4:10-CV-00601-EJL-MHW<br><br>**MEMORANDUM ORDER AND DECISION** |

Pending before the Court in the above-entitled matter is the Plaintiff's Motion for Preliminary Injunction. The parties have filed their responsive briefing and the matter is now ripe for the Court's consideration. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record.

Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this Motion shall be decided on the record before this Court without oral argument.

### Factual and Procedural Background

The Plaintiff, Rapid Hot Flow, LLC, filed a Verified Complaint in this matter on December 6, 2010 against the Defendants Rocky Mountain Oilfield Services, LLC, Southern Field Welding, LLC, Matthew Mason, and Michael Neil Justesen. (Dkt. No. 1.) The Complaint alleges claims for violation of Idaho's Trade Secrets Act, Conversion, Tortuous Interference with Prospective Economic Advantage, Negligent Interference with Prospective Economic Advantage, and Breach of Contract. (Dkt. No. 1.) The claims arise from the Defendants' alleged use of Rapid Hot Flow's proprietary information. (Dkt. No. 1, ¶ 12.)

Rapid Hot Flow provides frac water heating services to the oil and gas industry nationwide. (Dkt. No. 1, ¶ 10.) Rapid Hot Flow hired Matthew Mason in October of 2008 to work in a supervisory position at customer project sites where Rapid Hot Flow delivered frac water heating services. In this capacity, the Complaint alleges, Mr. Mason had access to Rapid Hot Flow's confidential, proprietary, and trade secret information which included: information about Rapid Hot Flow's methods, techniques, processes, formulas, schematics, records, marketing materials, and customer and price lists. (Dkt. No. 1, ¶ 12.) Rapid Hot Flow asserts Mr. Mason was also "integrally involved in, and intimately knowledgeable about," its development and acquisition of its valuable business and trade secrets relating to obtaining and retaining customers. (Dkt. No. 1, ¶ 12.) During his employment, the Complaint

argues, Mr. Mason developed close working relationships and goodwill with Rapid Hot Flow's customers which are critical to selling Rapid Hot Flow's services. (Dkt. No. 1, ¶ 13.) Such information and relationships obtained by Mr. Mason during his employment regarding Rapid Hot Flow and its customers, they allege, were trade secrets. Mr. Mason's employment was terminated in March of 2009.

Also during the summer of 2008, Rapid Hot Flow claims it entered into an agreement with Defendant Southern Field Welding through its owner Michael Justesen to manufacture customized frac water heating vehicles exclusively for Rapid Hot Flow. (Dkt. No. 1, ¶ 15.) Rapid Hot Flow asserts it gave Southern Field Welding industry-specific information regarding frac water heating vehicles and specifications for Rapid Hot Flow's vehicles in exchange for its agreement to refrain from selling frac water heating vehicles to Rapid Hot Flow's competitors. (Dkt. No. 1, ¶¶ 15-16.) In July of 2010, Southern Field Welding notified Rapid Hot Flow that it could not manufacture any additional frac water heating vehicles for it due to other commitments. (Dkt. No. 1, ¶ 18.)

Following his termination, Rapid Hot Flow alleges, Mr. Mason worked in collaboration with Southern Field Welding and Mr. Justesen to create Rocky Mountain Oilfield Services, LLC; pointing to the August 2010 Certificate of Organization for Defendant Rocky Mountain which lists Mr. Mason as a member/manager, lists Mr. Justesen as its registered agent, and provides the same street and mailing address as Southern Field Welding's principal office. (Dkt. No. 1, ¶ 19.) Through Rocky Mountain, Rapid Hot Flow asserts, the Defendants contacted at least two of Rapid Hot Flow's present customers - Delta

Petroleum and Noble Energy - and suppliers in an attempt to attract these businesses away from Rapid Hot Flow. (Dkt. No. 1, ¶ 20.) These activities were done, Rapid Hot Flow argues, using the proprietary information Mr. Mason was privy to during his employment at Rapid Hot Flow.

Rapid Hot Flow filed its Complaint to recover damages resulting from these activities and has also filed this Motion for Preliminary Injunction to halt the Defendants actions. Rapid Hot Flow seeks an injunction preventing Defendants from (a) providing any frac water heating services to Delta Petroleum and (b) soliciting or performing services for any of its current and potential frac water heating customers with which Mr. Mason had contact or about which he became aware through his employment with Rapid Hot Flow. (Dkt. No. 8.)

## Standard of Law

A preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment. *Textile Unlimited, Inc. v. A..BMH Co., Inc.*, 240 F.3d 781 (9th Cir. 2001) (citing *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). While courts are given considerable discretion in deciding whether a preliminary injunction should enter, injunctive relief is not obtained as a matter of right and it is considered to be an extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *See Sampson v. Murray,* 415 U.S. 61 (1974)*; Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.,* 363 U.S. 528 (1960); and *Stanley v. Univ. of Southern California,* 13 F.3d 1313 (9th Cir. 1994).

Until recently the preliminary injunction standard in the Ninth Circuit was that a party is entitled to a preliminary injunction when it can demonstrate either: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits, where the balance of hardships tips sharply in the movant's favor. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204-05 (9th Cir. 2000). The Supreme Court, however, recently found the Ninth Circuit's standard of the "possibility of irreparable harm" was too lenient and held that the moving party must demonstrate that irreparable injury is "likely in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 375-76 (2008) ("Issuing a preliminary injunction based only a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (citations omitted). Thus, the Supreme Court has now clarified that the standard for a preliminary injunction requires a plaintiff to show "[1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 129 S.Ct. at 374 (citations omitted).

No longer are plaintiffs granted the presumption of irreparable harm upon a showing of a likelihood of success on the merits. Instead, plaintiffs seeking a preliminary injunction must establish they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Jacobsen v. Katzer*, 609 F.Supp.2d 925, 936 (N.D. Cal. 2009). The Ninth Circuit recently recognized the applicability of the *Winter* decision in this Circuit stating the rule as: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *See American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir 2009) (quoting *Winter*, 129 S.Ct. at 374).

## ANALYSIS

### I. Likelihood of Success on the Merits

The Motion for Preliminary Injunction seeks an injunction based upon two of the five claims raised in the Complaint: violation of the Idaho Trade Secrets Act and tortious interference with prospective economic advantage. (Dkt. No. 8.) Applying the above-standard to these two claims, the Court finds as follows.

#### A. *Idaho Trade Secrets Act Claim ("ITSA")*

Rapid Hot Flow's first cause of action seeks recovery for violations of the ITSA alleging the Defendants misappropriated and misused its confidential, proprietary, and trade secret information. (Dkt. No. 1, ¶ 31.) The ITSA defines "misappropriation" as:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    (A) Used improper means to acquire knowledge of the trade secret;

Idaho Code § 48-801(2). To prevail on the misappropriation claim, Rapid Hot Flow must show that a trade secret existed and the Defendants acquired, disclosed, or used the trade secret by improper means. *See Northwest Bec-Corp v. Home Living Serv.*, 41 P.3d 263, 268 (Idaho 2002); *Basic American, Inc. v. Shatila*, 992 P.2d 175, 183 (Idaho 1999) ("In order to prevail in a misappropriation action under the ITSA, the plaintiff must show that a trade secret actually existed. Without a proven trade secret there can be no misappropriation, even if the defendants' action was wrongful.") (citing I.C. § 48-801) (citations and quotations omitted).

A "trade secret" is defined by the ITSA as:

(5) "Trade secret" means information, including a formula, pattern, compilation, program, computer program, device, method, technique or process, that:

    (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

    (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy....

Idaho Code § 48-801(5)(a)-(b). Customer lists are a type of information that can be protected as a trade secret. *See Northwest Bec-Corp.*, 41 P.3d at 267; *see also Wesco Autobody Supply,*

*Inc. v. Ernest*, 243 P.3d 1069, 1085 (Idaho 2010). In *Northwest Bec-Corp*, customer list were determined to be trade secrets under Idaho Code § 48-801. The issue in that case was "whether actual misappropriate occurred." *Northwest Bec-Corp.*, 41 P.3d at 267. Here, however, the parties disagree over whether the customer and business information outlined in the Complaint are trade secrets.

The Court finds the factors in the Restatement provides helpful guidance in determining whether the information constitutes "trade secrets" within the definition of the statute. *See Wesco*, 243 P.3d at 1086 (quoting *Basic Am.*, 992 P.2d at 184). The Restatement factors are: "(1) the extent to which the information is known outside [the plaintiff's] business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Id.* (citing Restatement of Torts § 757, comment b (1939)). "All of these factors address the issue of whether the information in question is generally known or readily ascertainable." *Id.* Not all of the Restatement factors must be present in order to find the existence of a trade mark. In determining whether the materials are "readily ascertainable," the Court also finds useful the definition of that term as set forth by the drafters of the Uniform Trade Secret Act: "Information is readily ascertainable if it is available in trade journals, reference books, or published materials." Uniform Trade Secret Act § 1, Commissioners' Comment, 14 uniform

Laws Annotated 439 (1990); *see Basic Am.*, 992 P.2d at 184.

Rapid Hot Flow asserts it has trade secret information relating to obtaining and retaining customers in the form of customer and supplier lists, price lists, methods, techniques, processes, formulas, schematics, records, and marketing materials. (Dkt. No. 8, p. 2.) In his supervisory capacity, Rapid Hot Flow argues, Mr. Mason had access to confidential, proprietary, and trade secret information regarding its customers that is confidential and generally not known to the public. (Dkt. No. 8, p. 2) (citing Dkt. No. 1, ¶ 13.) Further, Rapid Hot Flow argues that while present on customers' project sites, Mr. Mason was able to develop relationships of trust and goodwill with Rapid Hot Flow's customers. In arguing these customer contacts and information are its trade secrets, Rapid Hot Flow focuses mainly on two the of the Restatement factors: 1) the information's "independent economic value" and 2) the reasonable precautions taken to maintain its secrecy. (Dkt. No. 8, p. 9.) The Defendants argue the information is not a trade secret. After considering the factors, and only for purposes of this Motion, the Court concludes below that Rapid Hot Flow has demonstrated, at least at this stage, that it is likely to prevail on its ITSA claim to the extent it argues its customer pricing and financial information made known to its employees by virtue of their employment are trade secrets. The Court further finds below that Rapid Hot Flow is not likely to prevail on their ITSA claim to the extent it argues there are trade secrets in the customer relationships or frac water heating truck.

As to the first factor, the extent to which the information is known outside the business, Rapid Hot Flow maintains the information was not readily available to the public

but, instead, derived from the significant resources invested by Rapid Hot Flow. (Dkt. No. 1, ¶¶ 25-26.) The Defendants do not appear to argue the information is of the type known outside of the frac water heating business. Because customer and financing information is generally not known outside of the industry, this factor tips in favor of Rapid Hot Flow

As to the second factor, whether the information was known by others in the business, the parties disagree. Rapid Hot Flow maintains its customer pricing and financial information is proprietary and not known by others in the frac water heating industry. Rapid Hot Flow argues Mr. Mason's employment allowed him full access to vital information including pricing, contract, and financial details of Rapid Hot Flow's customer agreements as well as provided him the means with which to develop customer relationships. (Dkt. No. 20, p. 3.) Defendants counter that such information was generally known by all levels of employees and others involved in the business; arguing the information at issue was not trade secret information because "Rapid Hot Flow did not develop any customer lists, pricing indices, marketing strategies, or frac water heating technology on its own." (Dkt. No. 14, p. 2.) Instead, Defendants claim the information Rapid Hot Flow points to was generally common knowledge of others in the industry.

The Defendants' argument is that the information was generally known in the frac water heating industry and/or was knowledge obtained from Mr. Mason's previous employment. (Dkt. No. 14, Aff. Mason at ¶ 6.) The Defendants have filed Affidavits from both Mr. Mason and Mr. Hagstrom which note the lack of any specialized training provided by Rapid Hot Flow. (Dkt. No. 14, Affs. Mason, Hagstrom.) Mr. Mason states he received no

"special or secretive business information by Rapid Hot Flow which differed in any substantive way from the kind of information he already obtained from his prior work experience...." (Dkt. No. 14, p. 3); *see also* (Dkt. No. 14, Aff. Mason.) Any information he was given, Mr. Mason claims, was already generally and commonly known in the industry. Mr. Mason further contends he used his knowledge from his prior employment to assist Rapid Hot Flow in developing a pricing schedule on one contract for Occidental Petroleum in October of 2008. (Dkt. No. 14, Aff. Mason ¶ 4.) Rapid Hot Flow counters that Mr. Mason never assisted in setting any pricing. (Dkt. No. 20, p. 2; Aff. Bortz ¶ 3-5.)

Whether or not any specialized training was given or needed does not necessarily mean the Rapid Hot Flow's employees were not privy to trade secret information by virtue of their employment. The customer pricing and financing information as well as the development of goodwill and relationships with Rapid Hot Flow's customers can still be proprietary regardless of whether any particularized training was provided. The Court finds the fact that no formal training may have been provided does not negate the secret nature of the customer information at issue here. As to the parties' arguments over whether Mr. Mason assisted in setting the pricing and/or had a prior relationship with Delta Petroleum, the record is unclear. What is clear is that Mr. Mason, as well as most employees, had access to Rapid Hot Flow's customer and financing information. While Affidavits supplied by the Defendants from other business owners in the industry appear to show the customers sought out proposals or bids from frac water heating providers in search of cheaper rates, they do not indicate that others in the industry knew Rapid Hot Flow's customer and financial

information. (Dkt. No. 14, Aff. Epperson, Bonnie.) Thus, to the extent such information is not known in the industry this factor weighs in favor of Rapid Hot Flow.

The third factor, the extent of measures taken by Rapid Hot Flow to guard the secrecy of the information, is the source of great debate by the parties. Rapid Hot Flow asserts it took several measures to ensure the secrecy of its customer information by limiting the information to "only those employees who needed the information to perform their duties, placing locks on key filing cabinets and buildings, and requiring all recipients of the information to sign a legally binding confidentiality agreement" (Dkt. No. 8, pp. 9-10); see also (Dkt. No. 1, ¶¶ 27-28.) Defendants argue Rapid Hot Flow did not create nor keep secret the customer lists, pricing indices, marketing lists all of which were generally known and readily ascertainable. (Dkt. No. 14, pp. 14-17.)

Rapid Hot Flow points to its Agreement to Protect Trade Secrets and Non-Compete (the "Agreement") that it claims all employees were required to sign as a reasonable effort taken to maintain the secrecy of the information. (Dkt. No. 8, Aff. Bliss, Ex. A.) The Agreement states that Rapid Hot Flow will "provide Employee access to proprietary and confidential information regarding Rapid Hot Flow's clients and business as necessary..." and generally provides that the employee agrees such information constitutes trade secrets and will not disclose, retain, or misappropriate the trade secret information. (Dkt. No. 8, Aff. Bliss, Ex. A.) The Agreement also includes a non-compete clause whereby the employee will not compete with Rapid Hot Flow for a period of twenty-four months after termination of employment. (Dkt. No. 8, Aff. Bliss, Ex. A.)

The parties vigorously dispute whether all employees were required to sign the Agreement. Mr. Mason denies ever being asked to nor signing the Agreement, ever accessing Rapid Hot Flow's Business files, and that the information was kept confidential. (Dkt. No. 14, p. 4.) The information, he asserts, was freely discussed and shared among the employees regardless of their job description. (Dkt. No. 14, Aff. Mason, ¶ 3.) Defendants have also supplied an Affidavit of Michael Hagstrom, a Rapid Hot Flow driver/operator in the winter of 2008-09, who states he does "not recall signing any kind of an agreement with Rapid Hot Flow that restricted my use of any Rapid Hot Flow business information." (Dkt. No. 14, Aff. Hagstrom.) Though unable to produce Mr. Mason's signed Agreement, Rapid Hot Flow has provided the Agreement signed by Mr. Hagstrom on December 14, 2008. (Dkt. No. 20, Ex. A.) In addition, Rapid Hot Flow filed the Affidavit from Leslie Ann Staggs, its Office Manager, which states she personally witnessed Mr. Mason review and sign the Agreement and then filed it in his personnel file. (Dkt. No. 8, Aff. Staggs.) The Affidavit of Mr. Bortz also states he recalls Mr. Mason signing the Agreement. (Dkt. No. 20, Aff. Bortz.) Mr. Bortz further avers that Rapid Hot Flow "required all employees to execute noncompete agreements" and that he "countersigned the agreement executed by Mr. Mason." (Dkt. No. 20, Aff. Bortz, ¶ 9.)

The Court finds, at this stage, that Rapid Hot Flow is likely to be able to demonstrate it took reasonable measures to ensure the customer and pricing information remained confidential. This is evidenced by the Agreement which Rapid Hot Flow contends it required every employee to sign. Though Rapid Hot Flow has not produced a copy of the Agreement

signed by Mr. Mason, the fact that Rapid Hot Flow utilized such an Agreement in its business evidences efforts on the part of Rapid Hot Flow to maintain the confidentiality of its proprietary information. The Court further finds the Affidavits of Ms. Staggs and Mr. Bortz to be more telling than Mr. Hagstrom's statement that he "does not recall signing any kind of agreement" during his three months of employment at Rapid Hot Flow. (Dkt. No. 14, Aff. Hagstrom, ¶ 2.) The Court makes no determination at this time as to whether Rapid Hot Flow will ultimately be able to prove the information is trade secret or that Mr. Mason signed such Agreement. (Dkt. No. 20, p. 3-4 n. 1.) For purposes of this Motion for Preliminary Injunction only, the Court finds only that Rapid Hot Flow's Agreement indicates it is likely to be able to show reasonable efforts were taken to protect its confidential information.

The Court next considers Mr. Mason and Mr. Hagstrom claims that they both frequently discussed the names of customers, suppliers, and pricing information with other Rapid Hot Flow employees regardless of job description and their belief that the information was not considered secret as it was readily known by people in the business. (Dkt. No. 14, Affs. Mason and Hagstrom.) Whether or not Rapid Hot Flow employees discussed the subject information among themselves does not change the confidential nature of the information given all Rapid Hot Flow employees were purportedly subject to the Agreement. Again, the Court makes no determination at this time as to whether Rapid Hot Flow can ultimately prove all employees, let alone Mr. Mason in particular, had signed the Agreement. At this stage the Court finds only that for purposes of this Motion the existence of the Agreement demonstrates a likelihood that Rapid Hot Flow can show it took reasonable

efforts to protect its trade secret information. Thus, discussions by employees subject to the Agreement would not change the confidential nature of the information. As such, the Court finds this factor weighs in favor of Rapid Hot Flow because it is likely to be able to show reasonable efforts were taken to protect the consumer pricing and financing materials not generally accessible to people outside of Rapid Hot Flow.

On the fourth factor, the value of the information to Rapid Hot Flow and its competitors, Rapid Hot Flow again asserts the customer information is vital to its competitive position in the industry. This information made up its business plan and strategy for increasing its market share in the industry which has provided Rapid Hot Flow with a significant advantage over the competition. (Dkt. No. 8, p. 9); (Dkt. No. 20, Aff. Bortz, ¶ 8) ("there is significantly more to Frac Water Heating services agreement beyond price."). Defendants maintain the information is known in the industry. Because the record shows the information to have some value to Rapid Hot Flow, at this time, this factor tips slightly in favor of Rapid Hot Flow.

As to the fifth factor, the amount of effort or money expended by Rapid Hot Flow in developing the information, Rapid Hot Flow argues it expended a great deal of time and resources in developing the information; characterizing its investment as: ""major," "considerable," and "sizeable." (Dkt. No. 1, ¶ 22, 24, 25.) Rapid Hot Flow asserts it invested considerable time and money to develop its customer lists, pricing information, and frac water heating technology and methodologies. This factor seems to go in favor of Rapid Hot Flow in light of the efforts it appears to have taken to develop and protect the confidentiality

of its information.

Finally, the sixth factor considers the ease or difficulty with which the information could be properly acquired or duplicated by others. Here, both sides disagree about the availability of the information to others. Defendants maintain the information is not secret and, therefore, easily acquired by others in the industry. Rapid Hot Flow persist in arguing the vital customer information in terms of pricing contract details, and customer relationships are only made possible by virtue of ones employment with Rapid Hot Flow. (Dkt. No. 1, ¶ 26.) At this stage it seems the details of the customer contract and financial information of Rapid Hot Flow customers appears to be readily available to Rapid Hot Flow employees. The extent to which such information is likewise acquirable by others is less clear. As such, the factor favors neither side.

Having considered the Restatement factors, the Court concludes for purposes of this Motion that Rapid Hot Flow has shown a reasonable likelihood of success in proving the customer information relating to pricing, finances, and contracts are Rapid Hot Flow's trade secret information. At least as the record stands currently, the customer pricing and contract information do not appear to have been generally known outside of those individuals employed by Rapid Hot Flow. Though subject to dispute, Rapid Hot Flow has shown a likelihood of proving it has taken reasonable measures to ensure the secrecy of such information though its employment Agreement. The information also has value to Rapid Hot Flow's business in terms of structuring its pricing schemes and making business decisions. As such, the Court finds Rapid Hot Flow has shown a likelihood of success on the ITSA

claim.

However, as to the claim that the relationships Defendants developed with customers while employed by Rapid Hot Flow, the Court finds Rapid Hot Flow has not shown a likelihood of success.[1] Whether or not Mr. Mason had formed a relationship with Delta Petroleum, or other customers, prior to or during his employment with Rapid Hot Flow is unknown from the record at this time.[2] Moreover, Mr. Mason can use information, skills, training, and knowledge he acquired during his employment that was not trade secreted or otherwise protected. "An employee will naturally take with her to a new company the skills, training, and knowledge she has acquired from her time with her previous employer. This basic transfer of information cannot be stopped, unless an employee is not allowed to pursue her livelihood by changing employers." *Wesco*, 243 P.3d at 1086 (quoting *Northwest Bec-*

_____

[1] Again, the Court's conclusions are limited to its ruling on this Motion and not, at this time, dispositive of whether or not the customer relationships Mr. Mason developed during his employment with Rapid Hot Flow are trade secrets for purposes of the claims raised in the Complaint.

[2] Mr. Mason's Affidavit states he had a prior business relationship with both Occidental Petroleum and Delta Petroleum. (Dkt. No. 14, Aff. Mason ¶ 2.) In fact, Mr. Mason argues he was "recruited" by Rapid Hot Flow because he was working for its major competitor, was very knowledgeable in the business, and had existing business relationships with customers Rapid Hot Flow was interested in taking over. (Dkt. No. 14, p. 3); *see also* (Dkt. No. 14, Aff. Mason.) In reply, Mr. Bortz's Affidavit states that Mr. Mason's relationship with Delta Petroleum was made possible through his employment with Rapid Hot Flow; maintaining his prior employment did not include a customer relationship with Rapid Hot Flow's customer Delta Petroleum. (Dkt. No. 20, p. 2; Aff. Bortz ¶ 3-5.) Whether or not Mr. Mason had developed a prior relationship with Delta Petroleum is disputed in the current record. The Court finds at this time that Rapid Hot Flow is unable to demonstrate a likelihood of success on this aspect of its claims.

*Corp.*, 41 P.3d at 268); *but see Intermountain Eye and Laser Centers, P.L.L.C. v. Miller*, 127 P.3d 121, 128-29 (Idaho 2005).[3] As such, the Court does not find Rapid Hot Flow has demonstrated a likelihood of success as to any trade secret claim in its customer relationships.

The parties have also made arguments regarding the frac water heating trucks built for Rapid Hot Flow by Southern Field Welding. The Complaint itself does not contain an allegation of any trade secrets in the trucks.[4] (Dkt. No. 1.) Arguments relating to the trucks are primarily relevant to Rapid Hot Flow's claim for breach of contract against Southern Field Welding.[5] However, Rapid Hot Flow's initial briefing on the Motion for Preliminary

---

[3] In *Intermountain Eye*, the court stated: "An employer also has 'a protectable interest in the customer relationships its former employee established and/or nurtured while employed by the employer and is entitled to protect itself from the risk that a former employee might appropriate customers by taking unfair advantage of the contacts developed while working for the employer.'" The facts in that case are different from those presented in this case. The claim raised in *Intermountain Eye* was for breach of the employment agreement's covenant non-compete provision. The Court determined that employers generally have a protectable business interest in customer relationships which can be invoked with a non-compete. *Intermountain Eye*, 127 P.3d at 128-29. Here, Rapid Hot Flow has not alleged a claim for breach of any non-compete contract. (Dkt. No. 20, pp. 3-4, n. 1.) The ITSA claim here is for misappropriation of trade secrets relating in particular to the Defendants' actions with Delta Petroleum.

[4] Nor does Rapid Hot Flow's reply briefing on the Motion for Preliminary Injunction regarding trade secrets in the trucks. (Dkt. No. 20.)

[5] The Complaint alleges the parties entered into an agreement to have Southern Field Welding to build customize trucks to Rapid Hot Flow exclusively. (Dkt. No. 1, ¶ 16.) Southern Field Welding breached this agreement, the Complaint alleges, by manufacturing vehicles for Rocky Mountain with some, or all, of the customization that Rapid Hot Flow ordered. (Dkt. No. 1, ¶ 21.) Mr. Bliss further states that in October of 2010 he personally observed Southern Field Welding manufacturing trucks for another with the "exact same components, software and control mechanism that Rapid Hot Flow paid Southern Field

Injunction does raise arguments regarding the time and money expended by Rapid Hot Flow in developing and customizing the trucks built by Southern Field Welding. (Dkt. No. 8, pp. 6, 14.) These arguments do not appear to be that the trucks contain trade secret information but, instead, go to the other claims in the Complaint concerning misappropriation or tortious interference of Rapid Hot Flow's trade secrets and/or Southern Field Welding's breach of contract. (Dkt. No. 8, pp. 14-15.)

To the extent any trade secrets are alleged to exist in terms of the frac water heating trucks, however, the Court finds Rapid Hot Flow has not shown it is likely to succeed on the merits of such a claim. As the Defendants' materials point out, the design/operation of the trucks was generally known in the industry and is not confidential as to Rapid Hot Flow. (Dkt. No. 14, Aff. Justesen.) Defendants filed the Affidavit of Michael N. Justesen which details his knowledge regarding his contacts with Rapid Hot Flow's owner Bill Bortz in terms of their communications and work in designing and building the frac water heating trucks for Rapid Hot Flow. (Dkt. No. 14, Aff. Justesen.) Mr. Justesen's Affidavit states Rapid Hot Flow asked Southern Field Welding to build them a frac water heating truck by copying a truck Rapid Hot Flow had purchased from a different company. Mr. Justesen claims the controls were too "crude" to be copied and, ultimately Southern Field Welding "designed an automated control system to run the frac water heating trucks" that it built for Rapid Hot

Welding to develop exclusively for Rapid Hot Flow." (Dkt. No. 8, Aff. Bliss, ¶ 10.) The Affidavit of Tom Reagan also states he saw Mr. Mason on November 3, 2010 and learned that Southern Field Welding was manufacturing frac water heating trucks for him. (Dkt. No. 8, Aff. Reagan.)

Flow. Mr. Justesen goes on to state that the component parts for the frac water heating trucks and trailers that Rapid Hot Flow wanted to copy, and their capacities and specifications, are readily ascertainable from their website and not an industry secret. (Dkt. No. 14, Aff. Justesen ¶¶ 4-5.) Further, he claims, the component parts and systems necessary to create the truck for Rapid Hot Flow were all available from third party manufacturers. (Dkt. No. 14, Aff. Justesen ¶ 5.) Mr. Justesen did recognize that Rapid Hot Flow requested one change to the truck specifications to add a "21 mill BTU heater unit" which is reflected in the quotes. (Dkt. No. 14, Aff. Justesen ¶ 6.) Mr. Justesen maintains he has not used the drawings of the Rapid Hot Flow truck for any other customer including Rocky Mountain whose trucks are considerably different. (Dkt. No. 14, Aff. Justesen ¶ 7 and Exs. E, F.)

The allegations in the Complaint are not vastly different from the Defendants' version of how the trucks were designed with the exception of which party had greater input into the truck's design. The Complaint alleges Southern Field Welding had no prior experience in frac water heating manufacturing and, thus, Rapid Hot Flow had to provide it with a significant amount of industry-specific information and expertise. (Dkt. No. 1, ¶ 15.) Mr. Bliss' Affidavit notes that Rapid Hot Flow paid Southern Field Welding $20,000 to conduct the research and development necessary to customize the trucks to meet its specifications.[6] (Dkt. No. 8, Aff. Bliss, ¶ 5.) As to the design of the trucks, Mr. Bortz's Affidavit states Rapid Hot Flow "took its knowledge of existing Frac Water Heating technology and contracted

---

[6] Kevin Bliss is the Sales and Service Manager of Rapid Hot Flow. (Dkt. No. 8, Aff. Bliss.)

with Southern Field Welding to improve upon the design.[7] The result of that exclusive agreement was the development of technology which included an automatic computerized shut down system that prevented overheating." (Dkt. No. 20, Aff. Bortz ¶ 11.)

Based on the record at this point, and for purposes of this Motion, to the extent a trade secret is alleged in the frac water heating trucks the Court finds Rapid Hot Flow is not likely to succeed on such a claim. Though the trucks built for Rapid Hot Flow were built with some particular design specifications, the particularities were not secret or known only to Rapid Hot Flow. As pointed out in the Affidavit of Mr. Justesen, and the supporting materials attached thereto, the specifications for the Rapid Hot Flow truck appears to be either copied from another truck or available through third-party manufacturers. The Affidavits supplied by Rapid Hot Flow do not change this reality. Instead, the Affidavits on whole reflect the design process for the trucks was a collaborative effort between Rapid Hot Flow and Southern Fields Manufacturing utilizing the design from another industry truck and parts from third-party manufactures. The record shows the design and/or build of the truck was generally known in the industry or readily ascertainable and, therefore, are not trade secret. Whether or not Southern Fields Welding violated any exclusive arrangement with Rapid Hot Flow is a different question not decided here.

### B. Tortious Interference with Prospective Economic Advantage Claim

To establish a claim for interference with a prospective economic advantage, Rapid

---

[7] Bill Bortz is the general manager and owner of Rapid Hot Flow. (Dkt. No. 20, Aff. Bortz.)

Hot Flow must show: "(1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted." *Cantwell v. City of Boise*, 191 P.3d 205, 216 (Idaho 2008); *Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Trust*, 177 P.3d 955, 964 (Idaho 2008) ("This tort requires a showing that the interference was wrongful beyond the fact of interference itself.").

Here, Rapid Hot Flow alleges it had business relationships with various customers and prospective customers which contained the probability of future economic benefits to it. (Dkt. No. 1, ¶ 40-42.) The Complaint goes on to allege the Defendants were aware of these customer relationships, by virtue of their employment with Rapid Hot Flow, and wrongfully disrupted the same by marketing frac water heating services to said customers. (Dkt. No. 1, ¶ 43.) Such actions by Defendants, Rapid Hot Flow argues, caused tortious interference with its relationships with one or more of these customers or prospective customers resulting in damages.

Defendants counter that it did not interfere with Rapid Hot Flow's business relationships. In support of their argument, Defendants filed the Affidavit of Charles D. Epperson, Owner and President of a business in the industry, who states in his experience "it is not unusual for an oil company to frequently change providers of frac water heating services." (Dkt. No. 14, Aff. Epperson.) Defendants also supplied the Affidavit of Mark Bonnie, Field Operations Manager for Delta Petroleum. (Dkt. No. 14, Aff. Bonnie.) Mr.

Bonnie states he contacted Rocky Mountain to provide frac water heating services in the winter of 2010-11 because its prices were cheaper than Adler Hot Oil's prices. (Dkt. No. 14, Aff. Bonnie.) Mr. Mason's own Affidavit states that he submitted a proposal to Delta Petroleum at their request after they contacted him following the termination of his employment with Rapid Hot Flow. (Dkt. No. 14, Aff. Mason, ¶ 9.) Rapid Hot Flow replies with an Affidavit from Bill Bortz stating Mr. Mason had no prior relationship with Delta Petroleum before his job with Rapid Hot Flow and that it was only through his employment with Rapid Hot Flow that he developed a relationship with Mr. Bonnie at Delta Petroleum. (Dkt. No. 20, Aff. Bortz, ¶ 5.)

The Court finds Rapid Hot Flow has not shown a likelihood of success on the merits of its tortious interference claim. For purposes of this Motion, the Court has concluded above that Rapid Hot Flow has not shown a likelihood of success on its claim that their customer relationships are trade secrets. Thus, this claim is dependent upon what Rapid Hot Flow can establish in terms of its business agreement with Delta Petroleum and the facts surrounding Mr. Mason's employment with Rapid Hot Flow and his dealings with Delta Petroleum both before and after his employment with Rapid Hot Flow. These determinations are in dispute and unclear from the record at this time.[8] Though the Court found above that Rapid Hot Flow's use of the Agreement to be a reasonable measure taken to guard the security of its information, the fact remains that at this stage there is no Agreement signed by Mr. Mason

---

[8] *See* Footnote 2 *supra*.

in the record and the parties' Affidavits are contradicting in terms of Mr. Mason's relationship with Delta Petroleum. Therefore, the Court finds the record at this time does not support a finding that Rapid Hot Flow is likely to succeed on this claim.

## II.     Irreparable Injury and Balance of Hardships

As to the remaining considerations for a preliminary injunction, the Court finds Rapid Hot Flow has failed to demonstrate either irreparable injury or that the balance of hardships tips in its favor.

### A.     Irreparable Injury

As stated previously, a preliminary injunction requires the moving party to show "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 129 S.Ct. At 374. Irreparable harm exists where monetary damages provide inadequate relief, for example in cases involving environmental damage or human suffering. *See, e.g., Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120, 1124 (9th Cir. 2005) (environmental); *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (human suffering). "[A] preliminary injunction should only be granted if the movant does not have an adequate remedy at law." *Saini*, 434 F.Supp.2d at 918-19 (citations omitted). Applying these principles to the record here, the Court finds that Rapid Hot Flow has not demonstrated it is likely to suffer irreparable harm.

The damage alleged to be irreparable in this case has already been suffered. For example, Rapid Hot Flow points to its loss of Southern Field Welding as its supplier and the loss of Delta Petroleum and Noble Energy as customers. The damage from the loss of these suppliers and customers has already been incurred and would not be remedied by entering

a preliminary injunction at this stage. As such, any damages to Rapid Hot Flow for these events are economic. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987) ("temporary economic loss alone generally is not a basis for injunctive relief"). Further, preliminary injunctions are not warranted where they are based on a generalized threat of lost revenue, market value, and goodwill. *Los Angeles Memorial Coliseum Com'n v. Nat'l Football League*, 634 F.2d 1197, 1202-03 (9th Cir. 1980). Losses that are merely speculative are also insufficient to support a finding of irreparable harm; the injury, rather, must be actual or imminent. *Goldie's Bookstore v. Sup Ct.*, 739 F.2d 466, 472 (9th Cir. 1984) (trial court's findings that plaintiff would lose goodwill and "untold" customers held speculative on appeal). The damages alleged by Rapid Hot Flow here have already been suffered or are too speculative to support granting a preliminary injunction. Rapid Hot Flow's evidence of damages by way of lost customers demonstrates that these damages have already incurred. Any arguments about damages to potential customers is too speculative to support injunctive relief. This is particularly true under the new preliminary injunction standard requiring that irreparable injury be "likely." *Winter*, 129 S.Ct. at 374.

Further, the damages and harms alleged by Rapid Hot Flow for any generalized threat of lost revenue and profits can be adequately redressed by monetary relief. *See National Football League*, 634 F.2d at 1202-03. The Court does not opine one way or another about

whether the damages may be determined to be substantial. Monetary damages, even if substantial, are recoverable and "[t]ypically, monetary harm does not constitute irreparable harm." *California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) (citing *National Football League*, 634 F.2d at 1202); (Dkt. No. 27, p. 13-14).[9] Because Rapid Hot Flow has not demonstrated the existence of irreparable damages the Motion for Preliminary Injunction is denied.

### B.    Balance Hardships and Public Interest

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

---

[9]  In *Maxwell-Jolly*, the Ninth Circuit recently stated:

> We note also that Supreme Court case law and some of our own cases clarify that economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.... The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (internal quotation omitted)); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603("It is true that economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award."); *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 676 (9th Cir.1988); *Arcamuzi v. Cont'l Air Lines, Inc., 819 F.*2d 935, 938 (9th Cir.1987); Colo. *River Indian Tribes v. Town of Parker, 776 F.*2d 846, 850-51 (9th Cir. 1985); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471(9th Cir. 1984) ("Mere financial injury ... will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation.").

*Winter*, 129 S.Ct. at 374 (citations omitted); *see also Continental Airlines v. Intra Brokers, Inc.*, 24 F.3d 1099, 1104 (9th Cir. 1994) (stating that courts should balance hardships between plaintiffs and defendants in considering injunctions). "The factors examined above-the balance of equities and consideration of the public interest-are pertinent in assessing the propriety of any injunctive relief." *Id.* at 381. "The public interest inquiry primarily addresses [the] impact on non-parties rather than parties." *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002).

Rapid Hot Flow generally argues it should not suffer the alleged losses of its customers and profits as a result of the Defendants' wrongful conduct. The Defendants argue the information is not proprietary. The Court finds the public interest factor is a wash since the public has an interest in both keeping business trade secret information confidential as well as encouraging competition. In balancing the hardships, the Court finds it does not tip strongly in either sides favor. Rapid Hot Flow would likely suffer harm if their confidential information is used by their competition. This harm, however, has likely already occurred. The Defendants would suffer from the injunction by being improperly restrained from engaging in their business with the information they have obtained through their years of experience in the industry or information generally known in the business. The Court finds these arguments do not aid either party.

## III. Conclusion

Based on the foregoing and the record at this stage, the Court concludes that Rapid Hot Flow has demonstrated that it is likely to succeed on some of its claims but has not

demonstrated that it will suffer irreparable injury. *See GoTo.com*, 202 F.3d at 1209 (citation omitted). The record before the Court evidences that the damages are speculative, have already been incurred, and/or are calculable monetary damages all of which are not irreparable. As such the motion for preliminary injunction is denied.

## ORDER

Based on the foregoing and being fully advised in the premises, the Court HEREBY ORDERS that the Plaintiff's Motion for Preliminary Injunction (Dkt. No. 8) is **DENIED**.

DATED:  **March 15, 2011**

Honorable Edward J. Lodge
U. S. District Judge